IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs May 7, 2013

# STATE OF TENNESSEE v. MICHAEL SMITH

**Appeal from the Criminal Court for Shelby County**
**No. 09-04071      Carolyn Wade Blackett, Judge**

**No. W2011-01630-CCA-R3-CD - Filed July 12, 2013**

The defendant, Michael Smith, was convicted by a Shelby County Criminal Court jury of assault, a Class A misdemeanor, and aggravated burglary, a Class C felony, and sentenced as a multiple offender to concurrent terms of eleven months, twenty-nine days and seven years, respectively, in the Tennessee Department of Correction. In this *pro se* appeal, the defendant argues that: (1) the trial court erred in constructively amending the indictments in its charge to the jury; (2) the evidence is insufficient to sustain his convictions; (3) the State failed to provide sufficient notice in the indictment regarding the charge of aggravated burglary; (4) the trial court erred in failing to recuse itself prior to trial; (5) the trial court erred in failing to apply the appropriate standard to adjudicate the non-structural constitutional errors he raised in the motion for new trial; (6) he was denied a fair trial by the trial court impermissibly restricting his cross-examination of the victim; (7) he was denied a fair trial because the State did not give advanced notice that Officer Michael Garner would testify at trial; (8) the State knowingly introduced false testimony and evidence; (9) he was denied a fair trial because the trial court failed to make a determination regarding the admissibility of his prior convictions before he chose not to testify; (10) the State violated the Jencks Act by failing to provide a recording of a conversation between Kimberly Chrestman and the prosecutor; (11) he was denied a fair trial by Kimberly Chrestman's testifying about his prior bad acts; (12) the State committed prosecutorial misconduct in closing argument; (13) the trial court failed to give appropriate jury instructions; (14) the trial court erred in its sentencing determination; and (15) the trial court erred in revoking his bond. After review, we conclude that the trial court erred in constructively amending the indictment in its charge to the jury and that the defendant's convictions must be reversed and the case remanded for a new trial. In the event of further appellate review, we have assessed the defendant's remaining issues and discern no additional error.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Reversed
and Remanded for New Trial**

ALAN E. GLENN, J., delivered the opinion of the Court, in which JERRY L. SMITH and NORMA MCGEE OGLE, JJ., joined.

Michael Smith, Whiteville, Tennessee, Pro Se (on appeal); and Javier Bailey, Memphis, Tennessee (at trial).

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Paul F. Goodman, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

In the light most favorable to the State, the proof at trial showed that on February 9, 2009, the defendant's girlfriend, Kimberly Chrestman, went to the apartment of the victim, Matthew Ronning, where she remained for the evening. In the early morning hours of the next day, the victim went outside to his car and was attacked by the defendant. The defendant subsequently entered the victim's apartment and engaged in an altercation with Chrestman. As a result of these actions, the defendant was indicted on charges of aggravated assault and aggravated burglary.

**Trial**

At trial, the victim testified that, in February 2009, he lived in a two-bedroom apartment in midtown Memphis with a roommate, Marris Orange. On February 9, Kimberly Chrestman came to his apartment because she had decided to leave her live-in boyfriend, the defendant, and wanted the victim to take her to her mother's house in Mississippi early the next morning.

Around 4:00 a.m. the next morning, the victim went outside to unlock his car in preparation of taking Chrestman to Mississippi, while Chrestman stood outside the apartment and watched. As he started to unlock his car, the victim heard Chrestman scream, and he turned around "right as [the defendant] was swinging his arm down with some form of sharp instrument in his hand that I later saw was a screw driver. But he stabbed me in the back[.]" He said that he had just opened his car door and was standing outside the driver's side when the attack occurred.

The victim recalled that the defendant tried to stab him a couple more times, but he was able to fend off those attempts. The defendant then kicked him in the knee and pushed

him into the front seat of the car. The defendant "climbed in on top of [him] and started pummeling [his] he[a]d and upper body with his fists, trying to stab [him] again, but didn't succeed except once in [his] arm." The defendant continued to beat the victim until the victim was able to unlock the passenger's side door and tumble onto the ground. He rolled under the car parked next to his and called 911. The victim stated that he was "rather terrified" during the attack and described it as "an extremely frightening experience." The victim said that he believed his keys were still in the door of his car during the incident, and his house key was on the same ring. While he was under the car, he saw Chrestman and Orange inside the apartment, standing at the window in the front room.

The victim testified that he got out from under the car and "ran around the building and started pounding on [his] neighbor's window." However, the defendant somehow ended up at the back of the apartment and started attacking the victim again. When the victim's neighbor came outside, the defendant went back to the front of the building, and the victim heard Chrestman and Orange yelling from inside the apartment. The victim said that the only way into his apartment would have been to break a window or have the keys.

According to the victim, the defendant left the scene on his bicycle when the sound of sirens could be heard. The police arrived shortly thereafter. The victim observed that the door to Orange's bedroom had been "kicked off the hinges." When he returned from the hospital, he saw that the back exterior door was "off the hinges also and split" and the bathroom window was broken out. The victim stated that he did not attack the defendant or do anything to provoke the defendant other than "giv[e] shelter to his girlfriend."

On cross-examination, the victim stated that, to his knowledge, Chrestman was not under the influence of drugs when she arrived at his apartment. He denied that he and Chrestman used drugs that evening. The victim said that he did not know why it took him eight days after the attack to go to the police department and give a statement, but he denied that the delay was because he was "getting high" on drugs for several days. The victim denied initially telling the police that the defendant came at him with brass knuckles and a knife. The victim said that he told the police that the victim took his car keys, which he assumed because he found the keys in the front door and that was how the defendant could have gotten inside the apartment. The victim acknowledged a prior conviction for aggravated assault but denied having "a pretty nasty temper" or getting violent. The victim denied taking Chrestman to a friend's house the night of the incident.

Officer Gregory Hilliard with the Memphis Police Department testified that he arrived at the scene with his field-training officer at the time, Officer Barrett, around 4:30 or 5:00 a.m. He observed the victim sitting in a chair outside his apartment holding his head, which was bleeding. He also recalled seeing two women at the scene. He assessed the inside of the

apartment and saw that the bathroom window had been broken out and a bedroom door kicked in. Officer Hilliard noted that, as they were patrolling in the area prior to receiving the dispatch call, they observed a white male pass them on a bicycle. After they received the call detailing that the perpetrator had left the scene on a bicycle, they thought it likely that the man who had passed them was the perpetrator.

On cross-examination, Officer Hilliard recalled that, when he talked to the victim at the scene, the victim told him that "[h]e was approached with a knife and struck with brass knuckles, but he didn't recall it being just a fist only." He said that it was approximately "a minute, maybe a minute and a half" between when they saw the man ride past them on a bicycle and them arriving at the scene.

Officer Michael Garner with the Memphis Police Department testified that he and his team of five officers arrested the defendant on February 17, 2009, in a multiple unit apartment complex at 1050 North Parkway where the defendant's father lived. The defendant's father gave Officer Garner permission to enter his apartment and, once inside, Officer Garner observed a six-foot ladder under an opening in the ceiling that led to the attic. The defendant's father "didn't have a problem" with the officers entering the attic, so Officer Garner did so. He observed light coming from an adjacent apartment and alerted his partners to guard the exits. He then entered the crawlspace beneath the attic on his hands and knees from where he saw an opening into an adjacent apartment. He yelled to see if anyone was in the apartment, but no one answered him.

Officer Garner testified that he heard a door slam, and one of his partners radioed that someone had tried to exit the back door. Officer Garner again ordered that the person show himself, and then he received word that someone was attempting to exit through the front door. Officer Garner dropped down into the adjacent apartment and observed the defendant in the living room. The defendant was placed under arrest, and the officers "had to force entry on the back door" to get out because both exterior doors had dual-cylinder, keyed deadbolts.

Officer Garner testified that the defendant was arrested without a warrant, but the arrest was based on probable cause that he had committed the aggravated assault and aggravated burglary. He said that he was sent to the scene by officers in the robbery office to arrest the defendant only; he did not conduct a search for evidence. Officer Garner acknowledged seeing a woman in the apartment with the defendant's father, but he did not know who she was. The woman informed Officer Garner that she was in the apartment "to take care of the old man." Officer Garner acknowledged that he did not actually observe the defendant enter the adjacent apartment from his father's apartment. He said that the defendant did not make a statement to him.

Kimberly Chrestman acknowledged that she had been arrested on several prior occasions and admitted having a drug problem. Chrestman testified that the defendant was her boyfriend until he went to jail, and he had helped her recover from an illness.

Chrestman testified that she went to the victim's apartment on February 9, 2009, because she and the defendant had gotten into a fight and she was afraid of him. About an hour after she arrived, as she was sitting in a chair in the victim's bedroom, she saw the defendant peering in the window. However, she did not call the police because she had been smoking cocaine with the victim's roommate, Marris Orange. The victim and some of their other friends investigated the premises and thought the defendant was gone.

Chrestman testified that, later, the victim left the apartment and was going to his car when "out of nowhere [the defendant] pops up." Chrestman and Orange watched from the door as the defendant attacked the victim with a "silver and shiny" object, later learned to be a screwdriver. The defendant hit the victim several times, and the victim managed to get in his car in an attempt to get away from the defendant. However, the defendant got into the car with the victim and continued to attack him. At some point, Chrestman noticed that the defendant had the victim's keys in his hand, so she and Orange locked the door, ran into Orange's bedroom, and called 911. The defendant kicked the door, made of simple plywood, off its hinges and it "flew over [her] head[.]" He then dragged her into the living room by her hair and was cursing at her, but he left when he heard the sound of police and ambulance sirens.

Chrestman said that, after the incident, Orange took the victim's car to meet him at the emergency room and dropped Chrestman off at a friend's house on the way. Asked why she did not give a statement to the police that day or a couple of days later, Chrestman responded, "Because I don't like police. At that time we were doing illegal things, you don't want to go into a police station. And I wasn't exactly . . . living at my best back then." She stated that it was possible that she was on Prozac and Klonopin at the time of the crimes.

Chrestman acknowledged that she resumed her relationship with the defendant after the incident. She said that she was at the defendant's father's apartment when the police arrested him, and she did not tell the police that the defendant was "in the attic three apartments over." Chrestman denied that she threatened to testify against the defendant if he did not give her the house she was living in. She also denied telling the defendant, when she visited him at the jail prior to trial, that she was going to "send him away." Chrestman denied that the reason the victim went to his car the morning of the incident was to take her to her mother's house in Mississippi. She acknowledged that her memory was poor in general but was adamant that she "remember[ed] what happened that day."

Following the conclusion of the proof, the jury convicted the defendant of assault, as included in the first count of the indictment, and aggravated burglary, as charged in the second count of the indictment.

**Sentencing Hearing**

The trial court conducted a sentencing hearing, at which the State offered the defendant's presentence report, as well as certified copies of the defendant's prior rape and attempted rape convictions, into evidence. The State also offered proof that the defendant had a prior conviction for felony escape and a violation of probation out of another county. The defendant also pled guilty to felony damage of property in Washington state and ultimately violated his probation on that offense.

Although he denied that he was the perpetrator, the defendant admitted he pled guilty to the rape of a nurse that occurred in Memphis on March 19, 1995, and to the rape of a nineteen-year-old college student that occurred in Memphis on April 6, 1995. He acknowledged his prior conviction for felony escape out of Hardeman County in 1998, as well as a probation violation in that same county. He admitted to pleading guilty in Washington state to damage to government property but claimed that it was only a misdemeanor.

The defendant stated that he rode his bicycle to the victim's apartment looking for Chrestman "[t]o stop [her] from dying." He explained that Chrestman had been diagnosed with cervical cancer a couple months before the incident, and excessive drug use precipitated a situation where she was "hemorrhaging severely" and almost died. He was concerned because drug use and drinking alcohol "would cause her to hemorrhage even worse," so he "went everywhere" to look for her. When he arrived at the victim's apartment, Chrestman was "smoking crack." He admitted that he and the victim got into a fight and that he entered the victim's apartment, but he said that the front door was open. He denied that he kicked in the bedroom door or grabbed Chrestman by the hair. He said that it was physically impossible for the bedroom door to fly over Chrestman's head in the manner she described at trial.

The defendant testified that he completed high school and attended "[a] couple of years" of college at "Memphis State and Everett Community College." He said that he managed properties, including the apartment complex where he was arrested for the underlying crimes, which he also owned. He stated that he had been incarcerated for nine months at the time of sentencing and that he would abide by the terms of an alternative sentence if granted one.

The defendant testified that Chrestman and her mother had stolen most of his personal property at his house and withdrawn money from his account without his permission. However, he did not report the thefts to the police because he was incarcerated. He admitted that he was a registered sex offender in Tennessee.

After hearing arguments from the parties, the trial court sentenced the defendant to concurrent terms of eleven months and twenty-nine days on the assault conviction and seven years on the aggravated burglary conviction. In enhancing the defendant's sentence, the court found that the defendant had a previous history of criminal convictions or criminal behavior in addition to those necessary to establish his range, and he had a previous history of unwillingness to comply with the conditions of a sentence involving release into the community. The court found no applicable mitigating factors. The court found that the defendant was not a good candidate for probation and ordered that he serve his sentence in confinement.

## ANALYSIS

As an initial matter, we note that the State asserts that the defendant's motion for new trial was untimely filed and therefore this court should only review the defendant's claims of sufficiency, sentencing, and for any plain error. However, the defendant has provided documents indicative of his apparent compliance with the "mailbox rule." See Tenn. R. Crim. P. 49. Accordingly, we will address the defendant's claims.

### I. Constructive Amendment

The defendant argues that the trial court erred in constructively amending the indictment in its charge to the jury. He asserts that the indictment specified a theory for each charge, but the jury charge was not limited to those specific theories. Specifically, the indictment for aggravated assault charged that the defendant "did unlawfully and knowingly commit an assault on [the victim] and use[d] or display[ed] a deadly weapon and cause[d] bodily injury to the said [victim]." However, the court charged the jury that aggravated assault could be committed by causing bodily injury to another or causing another to reasonably fear imminent bodily injury. See Tenn. Code Ann. §§ 39-13-101(a)(1), (2); -102(a)(1)(A). Similarly, the indictment for aggravated burglary charged that the defendant entered the victim's habitation with intent to commit assault, but the charge to the jury included the additional theory of aggravated burglary that the defendant entered the victim's habitation *and committed or attempted to commit* an assault. See id. §§ 39-14-402(a)(1), (a)(3) ; -403(a).

It appears the defendant failed to include this issue in his *pro se* motion for new trial, which results in waiver of the issue on appeal, absent plain error. See Tenn. R. App. P. 3(e) (providing for waiver of issues not specifically stated in a motion for new trial); State v. Hatcher, 310 S.W.3d 788, 808 (Tenn. 2010) (stating that a defendant waives those issues not raised in a motion for new trial and those issues are subject to plain error review). In order for us to find plain error: (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is "necessary to do substantial justice." State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). The presence of all five factors must be established by the record before we will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one factor cannot be established. Id. at 283.

Both the Federal and Tennessee Constitutions guarantee a criminal defendant knowledge of the "nature and cause of the accusation." U.S. Const. amend. VI; see also Tenn. Const. art. I, § 9. An indictment, therefore, must provide notice of the offense charged, adequate grounds upon which a proper judgment may be entered, and suitable protection against double jeopardy. Tenn. Code Ann. § 40-13-202; State v. Byrd, 820 S.W.2d 739, 740-41 (Tenn. 1991). "[A] defendant cannot legally be convicted of an offense which is not charged in the indictment or which is not a lesser offense embraced in the indictment." State v. Cleveland, 959 S.W.2d 548, 552 (Tenn. 1997) (citing State v. Trusty, 919 S.W.2d 305, 310 (Tenn. 1996)).

"[N]ot only must the government prove the crime it charges, it must charge the crime it proves" and "after an indictment has been returned, its charge may not be broadened or changed except by action of the grand jury." State v. Goodson, 77 S.W.3d 240, 244 (Tenn. Crim. App. 2001). As this court observed in Goodson,

[C]ourts [must] distinguish between constructive amendments of the indictment, which are reversible *per se*, and variances between indictment and proof, which are evaluated under the harmless error doctrine. The accepted test is that a constructive amendment of the indictment occurs when the jury is permitted to convict the defendant upon a factual basis that effectively modifies an essential element of the offense charged. . . . . In such cases, reversal is automatic, because the defendant may have been convicted on a ground not charged in the indictment. . . . If, on the other hand, the variation between proof and indictment does not effectively modify an essential element of the offense charged, "the trial court's refusal to restrict the jury charge to

-8-

the words of the indictment is merely another of the flaws in trial that mar its perfection but do not prejudice the defendant."

Id. (quoting United States v. Adams, 778 F.2d 1117, 1123 (5th Cir. 1985)).

Another panel of this court, in addressing a situation concerning a constructive amendment, noted that the State was not required to "allege every alternative mode of liability available under [the statute] . . . [but], by alleging a specific statutory mode of liability, the State was obliged to prove that mode of liability and was precluded from achieving a conviction under a mode of liability different than that alleged in the indictment." State v. Roger W. Christy, No. M2011-00852-CCA-R3-CD, 2012 WL 804064, at *6 (Tenn. Crim. App. Mar. 12, 2012) (citing State v. Paul Richardson, No. W2008-02506-CCA-R3-CD, 2010 WL 3791973 (Tenn. Crim. App. Sept. 29, 2010), perm. app. denied (Tenn. Mar. 9, 2011); State v. Jamie Roskom, No. M2006-00764-CCA-R3-CD, 2007 WL 432989 (Tenn. Crim. App. Feb. 9, 2007); State v. Atta Najjar, No. W2003-00329-CCA-R3-CD, 2004 WL 123213 (Tenn. Crim. App. Jan. 21, 2004), perm. app. denied (Tenn. June 1, 2004)) (parentheticals omitted).

Here, the State alleged one theory of liability in each count of the indictment, but the court included additional theories in its charge to the jury. This is particularly of concern in this case because of the victim's testimony that he was terrified and frightened during the attack, which could have caused some jurors to convict the defendant based on bodily injury to the victim and some to convict based on the victim's being in fear of imminent bodily injury – a theory not charged in the indictment. Likewise, with regard to the aggravated burglary charge, the proof was more clear that the defendant committed or attempted to commit an assault, rather than just had the intent to commit an assault when he entered the apartment as had been alleged in the indictment. "Because the indictment in this case specifies 'a particular means of committing the offense in the indictment, the defendant was not given proper notice that the jury would be allowed to find him guilty under a different element of the offense.'" Paul Richardson, 2010 WL 3791973, at *9 (quoting Atta Najjar, 2004 WL 123213, at *5). Therefore, the trial court constructively amended the indictment. See State v. Eric Lebron Hale, No. M2011-02138-CCA-R3-CD, 2012 WL 3776673, at *10 (Tenn. Crim. App. Aug. 31, 2012) (determining that the trial court constructively amended the indictment where the indictment "alleged only the 'by violence' mode of robbery[, but] . . . the trial court instructed the jury that it could convict the defendant of aggravated robbery by '*the use of violence or putting the person in fear*.'"

We conclude that the five factors for finding plain error are present in this case and determine that the defendant's convictions must be reversed and the case remanded for a new trial. Although the defendant's remaining issues are pretermitted due to this conclusion, we

will briefly address the issues in the event of further appellate review.

## II. Sufficiency of the Evidence

The defendant argues that the evidence is insufficient to sustain his conviction for aggravated burglary. He asserts that the State failed to prove that he did not have the consent of the owner to be on the property because he had been to the victim's residence on "numerous occasions" in the past. He also asserts that the State failed to prove that he entered the apartment with the intent to commit an assault.

In considering this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). The same standard applies whether the finding of guilt is predicated upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

A criminal offense may be established entirely by circumstantial evidence. State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010). It is for the jury to determine the weight to be given the circumstantial evidence and the extent to which the circumstances are consistent with the guilt of the defendant and inconsistent with his innocence. State v. James, 315 S.W.3d 440, 456 (Tenn. 2010). In addition, the State does not have the duty to exclude every other reasonable hypothesis except that of the defendant's guilt in order to obtain a conviction based solely on circumstantial evidence. See State v. Dorantes, 331 S.W.3d 370, 380-81 (Tenn. 2011) (adopting the federal standard of review for cases in which the evidence is entirely circumstantial).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

This well-settled rule rests on a sound foundation. The trial judge and

the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

As relevant here, aggravated burglary occurs when one enters a habitation with the intent to commit a felony, theft, or assault. Tenn. Code Ann. §§ 39-14-401; -402; -403. In the light most favorable to the State, the evidence shows that, around 4:00 a.m., after being involved in an altercation with the victim, the defendant took the victim's keys from the victim's car, used them to enter the victim's home, broke down a bedroom door and assaulted Kimberly Chrestman by dragging her out of the bedroom by her hair while calling her a "dumb bitch." The victim testified that his house key was on the same ring as his car key, and his keys were in the door of his car when the defendant was attacking him. The keys were later found in the front door of the victim's apartment.

It was within the province of the jury to infer that any alleged consent the defendant had to enter the victim's residence was revoked upon the defendant's attacking the victim. It was also within the province of the jury to infer that the defendant intended to commit an assault inside the defendant's home when he entered the home without permission and broke down a door to get to Chrestman. This court has previously noted, in the context of reviewing a burglary conviction, that "[o]ne's actions are circumstantial evidence of his intent." State v. Barker, 642 S.W.2d 735, 737 (Tenn. Crim. App. 1982). There is sufficient proof for a rational trier of fact to find the defendant guilty of aggravated burglary.

### III. Notice Regarding Charge of Aggravated Burglary

The defendant argues that the indictment failed to provide sufficient notice regarding the charge of aggravated burglary because it did not list the victim of the intended assault inside Matthew Ronning's habitation. It appears that the defendant failed to include this issue in his motion for new trial and has therefore waived it on appeal.

-11-

Moreover, we discern no plain error as to this issue because a clear and unequivocal rule of law was not breached. The indictment charged the defendant with aggravated burglary as follows: "[The defendant] on February 10, 2009 in Shelby County, Tennessee, . . . did unlawfully and knowingly enter the habitation of Matthew Ronning, not open to the public, without the effective consent of the said Matthew Ronning, with intent to commit assault, in violation of T.C.A. 39-14-403[.]" It was not necessary for the aggravated burglary count of the indictment to state the intended victim of the underlying assault in order to put the defendant sufficiently on notice of the charge for which he would be required to defend himself. See, e.g., State v. Robert Allen Crawford, No. E2003-00627-CCA-R3-CD, 2004 WL 442906, at *9 (Tenn. Crim. App. Mar. 9, 2004), perm. app. denied (Tenn. Oct. 4, 2004) (noting that the indictment alleged that the defendant entered "'a habitation, the property of [the victim], without the effective consent of the owner(s) and with the intent to commit an assault'"); James E. Kenner v. State, No. 01C01-9709-CR-00424, 1999 WL 333097, at *8 (Tenn. Crim. App. May 26, 1999) (stating the indictment alleged the petitioner "'did enter the habitation of [the victims] with the intent to commit theft in violation of Tenn. Code Ann. § 39-14-403, and against the peace and dignity of the State of Tennessee'"), perm. app. denied (Tenn. Oct. 4, 1999); State v. Derek Denton, No. 02C01-9409-CR-00186, 1996 WL 432338, at *12 (Tenn. Crim. App. Aug.2, 1996) (noting aggravated burglary indictment charged defendant with entering home without consent of owner "and with the intent to commit aggravated assault"); cf. State v. Haynes, 720 S.W.2d 76, 83 (Tenn. Crim. App. 1986) (noting that "[a]n indictment for burglary must set forth and define the felony intended to be committed[,]" but it was "not necessary to set forth exactly what the burglar intended to steal" in a case where larceny was the intended felony).

## IV. Recusal

The defendant argues that the trial court erred in failing to recuse itself prior to trial. Again, this issue was not raised in the defendant's motion for new trial, and we conclude that plain error does not exist because the record does not clearly establish what occurred in the trial court. The record contains an order of recusal entered by the trial court on April 23, 2012, well after the defendant's trial and motion for new trial, but it is the only document relevant to this issue in the record. The record does not contain a motion for recusal or a hearing on a motion for recusal, and the reasons for recusal are not provided in the order of recusal.

## V. Trial Court's Review of Non-Structural Errors

The defendant argues that the trial court erred in failing to apply the appropriate standard to adjudicate the non-structural constitutional errors he raised in the motion for new

trial. He asserts that the State asserted at the motion for new trial that he "failed to prove that the multitude of Constitutional errors resulted in an unfair trial." He claims that, because the trial court did not make findings of fact in its denial of his motion for new trial, the court concurred with the State's argument which essentially put the burden on him to prove that the errors affected the verdict, rather than putting the burden on the State "to prove beyond a reasonable doubt that the Constitutional errors that did occur were harmless."

"[U]nless a party moves the trial court to set forth findings of fact and conclusions of law, the court's order need state only whether the motion for new trial was granted or denied." State v. Byington, 284 S.W.3d 220, 226 (Tenn. 2009). Even assuming the State argued for the incorrect burden of proof, we cannot assume that the trial court applied an inappropriate standard of review simply because it did not make findings of fact – something it was not required to do.

## VI. Cross-Examination of Victim

The defendant argues that he was denied a fair trial because the trial court impermissibly restricted his cross-examination of the victim, specifically, the victim's "history of assaultive conduct."

A defendant's constitutional right to confront witnesses against him includes the right to conduct meaningful cross-examination. Pennsylvania v. Ritchie, 480 U.S. 39, 51 (1987); State v. Brown, 29 S.W.3d 427, 431 (Tenn. 2000). "The propriety, scope, manner and control of the cross-examination of witnesses, however, rests within the discretion of the trial court." State v. Dishman, 915 S.W.2d 458, 463 (Tenn. Crim. App. 1995) (citations omitted). This court will not, therefore, disturb a trial court's limits on cross-examination unless we find that the court has placed unreasonable restrictions on that right. State v. Wyrick, 62 S.W.3d 751, 770 (Tenn. Crim. App. 2001); Dishman, 915 S.W.2d at 463.

We cannot conclude that the trial court abused it discretion in its control of the cross-examination of the victim. Prior to the victim testifying, the court ruled that the defense could not ask the victim about a prior domestic assault conviction, as it was a misdemeanor and not a crime of dishonesty. The defendant was allowed to ask the victim about his prior conviction for aggravated assault and whether he had "a pretty nasty temper" or "g[o]t violent" before the State objected to any further questioning about the victim's being violent. We discern no impermissible restriction on the defendant's cross-examination of the victim.

## VII. Notice of a Witness

The defendant argues that he was denied a fair trial because the State failed to give advanced notice that Officer Michael Garner would testify at trial. He asserts that, because he did not know Officer Garner was going to testify, he was not able to summon the former tenant of the adjacent apartment where he was arrested, who would have testified that he was in the attic "attempting to fix a problem."

The State must include in the indictment "the names of the witnesses as [it] intends shall be summoned in the cause." Tenn. Code Ann. § 40-17-106. The purpose of the statute is "to prevent surprise to the defendant at trial and to permit the defendant to prepare his or her defense to the indictment." State v. Allen, 976 S.W.2d 661, 667 (Tenn. Crim. App. 1997). In order to obtain relief, a defendant must show "prejudice, bad faith, or undue advantage" as a result of the State's delay in furnishing the witness's name. State v. Harris, 839 S.W.2d 54, 69 (Tenn. 1992) (citing State v. Baker, 751 S.W.2d 154, 164 (Tenn. Crim. App. 1987); State v. Craft, 743 S.W.2d 203 (Tenn. Crim. App. 1987)). "'In this context, it is not the prejudice which resulted from the witnesses' testimony but the prejudice which resulted from the defendant's lack of notice which is relevant.'" State v. Wilson, 164 S.W.3d 355, 362 (Tenn. Crim. App. 2003) (quoting State v. Jesse Eugene Harris, No. 88-188-III, 1989 WL 60393, at *8 (Tenn. Crim. App. June 7, 1989), perm. app. denied (Tenn. Aug. 7, 1989)).

The defendant has failed to show "prejudice, bad faith, or undue advantage" as a result of the State's delay in furnishing Officer Garner's name. There is simply no proof that the State did not provide the officer's name in bad faith or to obtain an undue advantage. The defendant alleges prejudice caused by the delay, but such prejudice is speculative and unsubstantiated.

## VIII. Knowingly Introducing False Testimony and Evidence

The defendant argues that the State "intentionally, knowingly, and willfully" elicited "perjurous testimony" from Officer Garner that the defendant was arrested at his father's residence on February 17, 2009, and presented fabricated documentation that he had been arrested on February 17, 2009, when he was actually arrested on February 19, 2009, and the residence was his own. He also points to Kimberly Chrestman's testimony about the bedroom door flying over her head as being "untrue per the laws of nature" and that the quitclaim deed was actually signed by her.

"[A] conviction obtained through use of false evidence, known to be such by representatives of the State," violates due process. Napue v. Illinois, 360 U.S. 264, 269

(1959); see State v. Spurlock, 874 S.W.2d 602, 617 (Tenn. Crim. App. 1993). "The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." Napue, 360 U.S. at 269. Accordingly, the State has an affirmative duty to correct false testimony when a witness testifies falsely on direct or cross-examination. Spurlock, 874 S.W.2d at 617. In order to prevail on a claim that the State knowingly presented or failed to correct false testimony or evidence, the defendant must establish by a preponderance of the evidence "(a) that false or perjured testimony was admitted at trial, (b) that the [S]tate either knowingly used such testimony or knowingly allowed it to go uncorrected, and (c) that the testimony was material and deprived him of a fair trial." Roger Morris Bell v. State, No. 03C01-9210-CR-00364, 1995 WL 113420, at *8 (Tenn. Crim. App. Mar. 15, 1995), perm. app. denied (Tenn. Aug. 28, 1995).

The defendant has failed to establish these factors. Assuming February 19 was the correct arrest date, it is possible that, at trial, Officer Garner misread the date on the arrest ticket, rather than intentionally lied about it, and we do not see how such date is material or prejudiced the defendant under the facts of the case. We also fail to see how testimony about the officers' looking for the defendant at "his father's house," Chrestman describing that the door flew over her head, or Chrestman's testimony about signing the quitclaim deed was material or deprived the defendant of a fair trial.

## IX. Determination of the Defendant's Prior Convictions

The defendant argues that he was denied a fair trial because the trial court did not make a determination regarding the admissibility of his prior convictions before he made the decision whether to testify.

During the voir dire of the defendant, defense counsel questioned him about his awareness of the notice of intent to impeach with prior convictions, rape and attempted rape, filed by the State. Asked whether he wanted to testify, the defendant said, "I was hoping to get some kind of ruling where the Court wouldn't allow the prior convictions first before I made this decision." Defense counsel responded, "[D]id I tell you, . . . that so long as [the prosecutor] has filed his proper notices and they fall within the period of time and fall within the type of . . . relevance, that this Judge is going to let them in. . . . [S]he doesn't have a choice in this matter." The defendant answered, "[I]f that would be the Court's decision, then I have no choice but to decline to testify; otherwise, I would. The court then asked the defendant if he wanted to testify, and he said, "Under the circumstances, with the prior convictions being admissible, no."

A conviction may be used to impeach the testimony of an accused in a criminal prosecution if the following four conditions are satisfied: (1) the conviction is for a crime

punishable by death or imprisonment in excess of one year, or the conviction is for a misdemeanor which involved dishonesty or false statement; (2) less than ten years has elapsed between the date the accused was released from confinement and the commencement of the subject prosecution; (3) the State gives reasonable pretrial written notice of the particular conviction or convictions it intends to use as impeachment; and (4) the trial court concludes that the probative value of the prior conviction on the issue of credibility outweighs its unfair prejudicial effect on the substantive issues. Tenn. R. Evid. 609; State v. Mixon, 983 S.W.2d 661, 674 (Tenn. 1999).

Two factors should be considered when deciding whether the probative value of a prior conviction outweighs its unfair prejudicial effect. Id. First, "[a] trial court should . . . analyze the relevance the impeaching conviction has to the issue of credibility." Id. (citation omitted). Second, if the trial court finds that the prior conviction is probative of the defendant's credibility, then the court should "'assess the similarity between the crime on trial and the crime underlying the impeaching conviction.'" Id. (quoting Neil P. Cohen et al., Tennessee Law of Evidence § 609.9 at 376 (3d ed. 1995)). The more similar the impeaching conviction is to the offense for which the defendant is on trial, the greater the risk of a prejudicial effect to the defendant. Id.

We note that, based on the entire interchange between the defendant, defense counsel, and the trial court, the court essentially adopted defense counsel's assessment of the admissibility of the convictions. In any event, the failure to conduct an official hearing was harmless as the prior convictions would have been properly admitted into evidence given that they were probative of the defendant's credibility and not similar to the offenses for which he was on trial.

## X. Jencks Issue

The defendant argues that he was denied a fair trial because the State violated the Jencks Act by failing to produce a disc of a conversation between Kimberly Chrestman and the prosecutor.

After Chrestman testified at trial, the prosecutor informed the court that he did not have a Jencks statement from the witness because Chrestman did not give a statement to the police. The prosecutor stated, however, that he had a recorded statement from Chrestman saying that she would cooperate with them, something he felt was necessary after Chrestman failed to appear at the preliminary hearings in two other matters. He said that there was nothing on the disc that pertained to the present case other than "that she is going to be willing to cooperate because just a few days prior she had missed a preliminary hearing appointment." The prosecutor said that he wanted to make the recording available to

defense counsel because he did not "want anybody to think [he was] hiding something," but evidently he failed to provide the disc.

Tennessee Rule of Criminal Procedure 26.2(a), commonly referred to as the Jencks Rule, provides,

> After a witness other than the defendant has testified on direct examination, the court, on motion of a party who did not call the witness, shall order the attorney for the state or the defendant and the defendant's attorney to produce, for the examination and use of the moving party, any statement of the witness that is in their possession and that relates to the subject matter of the witness's testimony.

A "statement" is defined as "[a] written statement that the witness makes and signs, or otherwise adopts or approves" or "[a] substantially verbatim, contemporaneously recorded recital of the witness's oral statement that is contained in a stenographic, mechanical, electrical, or other recording or a transcription of such a statement." Tenn. R. Crim. P. 26.2(f)(1), (2).

From what we glean from the record, it does not appear that the disc constituted Jencks material that would be subject to production by the State. The defense knew that Chrestman had refused to give a statement to police and used her refusal to impeach her credibility on cross-examination. The prosecutor explained that the recording he had was to memorialize that Chrestman was willing to cooperate because her cooperation was in doubt. There is no proof that anything on the disc "relate[d] to the subject matter of the witness's testimony." Tenn. R. Crim. P. 26.2(a).

## XI. Kimberly Chrestman's Testimony

The defendant argues that he was denied a fair trial by Kimberly Chrestman's "repeated impermissible trial testimony alleging 'bad acts' by [the defendant]." He states that Chrestman was instructed by the prosecutor to not make any comments unrelated to the present case, but he points to approximately nineteen different instances of Chrestman, nonetheless, mentioning his "prior bad acts" or referring to his character.

We have reviewed the record and note that no objection was made by the defendant to any of the complained-of references. Since no objection was made at trial, the objection to them is waived on appeal. See Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an

error."). Again, in determining whether an alleged trial error constitutes "plain error," we consider five factors: (1) the record must clearly establish what occurred at trial; (2) a clear and unequivocal rule of law must have been breached; (3) a substantial right of the defendant must have been adversely affected; (4) the defendant did not waive the issue for tactical reasons; and (5) consideration of the error is "necessary to do substantial justice." See Adkisson, 899 S.W.2d at 641-42. Ultimately, the error must have "had an unfair prejudicial impact which undermined the fundamental fairness of the trial." Id. at 642.

We conclude that consideration of the error is not "necessary to do substantial justice" because, of the nineteen references cited by the defendant, fourteen were elicited by the defense on cross or recross examination. Of the five remaining alleged instances that were made during the State's questioning, two were made during redirect examination and were within the scope of cross-examination. Moreover, many of Chrestman's responses of which the defendant complains did not concern "bad acts," but instead were simply factual statements such as "until he went to jail here," "he sent me from prison," and "I sent it back to him in jail." We cannot conclude that any of Chrestman's responses had an unfair prejudicial impact which undermined the fundamental fairness of the trial.

## XII. Prosecutorial Misconduct

The defendant argues that the State committed prosecutorial misconduct in its closing argument. He alleges approximately fourteen instances where he claims the prosecutor misstated or misled the jury regarding the evidence, commented on the credibility of the evidence and witnesses, used arguments calculated to inflame the jury, or argued facts not in evidence. We have reviewed each of these allegations and note that the defendant did not object to any of the statements at trial.

The failure to object to closing argument at trial waives our consideration of this issue on appeal. See Tenn. R. App. P. 36(a); State v. Stephenson, 195 S.W.3d 574, 601 (Tenn. 2006); State v. Thomas, 158 S.W.3d 361, 413 (Tenn. 2005); State v. Little, 854 S.W.2d 643, 651 (Tenn. Crim. App. 1992) (holding that the defendant's failure to object to the State's alleged misconduct during closing argument waives that issue). Thus, the defendant is not entitled to relief on appeal unless the remarks constitute "plain error." See Tenn. R. App. P. 36(b); State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000).

Tennessee courts "have traditionally provided counsel with a wide latitude of discretion in the content of their final argument" and trial judges with "wide discretion in control of the argument." State v. Zirkle, 910 S.W.2d 874, 888 (Tenn. Crim. App. 1995). A party's closing argument "must be temperate, predicated on evidence introduced during the trial, relevant to the issues being tried, and not otherwise improper under the facts or

-18-

law." State v. Middlebrooks, 995 S.W.2d 550, 557 (Tenn. 1999). The five generally recognized areas of prosecutorial misconduct in closing argument occur when the prosecutor intentionally misstates the evidence or misleads the jury on the inferences it may draw from the evidence; expresses his or her personal opinion on the evidence or the defendant's guilt; uses arguments calculated to inflame the passions or prejudices of the jury; diverts the jury from its duty to decide the case on the evidence by injecting issues broader than the guilt or innocence of the accused under the controlling law or by making predictions on the consequences of the jury's verdict; and intentionally refers to or argues facts outside the record, other than those which are matters of common public knowledge. State v. Goltz, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003).

We have reviewed the relevant portions of the transcript of the closing argument and determined that all of the prosecutor's statements were within the bounds of acceptable argument. As such, we conclude that there was no clear and unequivocal rule of law breached in this case and, accordingly, no plain error.

## XIII. Jury Instructions

The defendant argues that the trial court failed to give proper jury instructions. Specifically, he asserts that the court failed to charge all of the lesser-included offenses of aggravated assault; did not give instructions on the missing witness rule, the cancellation rule, the physical facts rule, and duress and necessity; and gave an "unconstitutional flight instruction."

"It is well-settled in Tennessee that a defendant has a right to a correct and complete charge of the law so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." State v. Farner, 66 S.W.3d 188, 204 (Tenn. 2001) (citing State v. Garrison, 40 S.W.3d 426, 432 (Tenn. 2000); State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990)). Accordingly, trial courts have the duty to give "a complete charge of the law applicable to the facts of the case." State v. Davenport, 973 S.W.2d 283, 287 (Tenn. Crim. App. 1998) (citing State v. Harbison, 704 S.W.2d 314, 319 (Tenn. 1986)). An instruction will be considered prejudicially erroneous only if it fails to submit the legal issues fairly or misleads the jury as to the applicable law. State v. Faulkner, 154 S.W.3d 48, 58 (Tenn. 2005) (citing State v. Vann, 976 S.W.2d 93, 101 (Tenn. 1998)).

### A. Instruction on Lesser-Included Offenses of Aggravated Assault

The defendant contends that the trial court should have given "the full instruction as to lesser included offenses of [a]ggravated [a]ssault," specifically the offense of assault by extremely offensive or provocative physical contact. We note that in a discussion

concerning the jury charge, the trial court discussed which lesser-included offenses it planned to charge and said that it planned to charge assault. The trial court did indeed charge the jury on assault, but only assault by causing bodily injury to another or causing another to be in reasonable fear of imminent bodily injury, see Tenn. Code Ann. § 39-13-101(a)(1), (2), not assault by causing extremely offensive or provocative physical contact, see id. § 39-13-101(a)(3). However, we conclude that the court's failure to include this method of assault in its charge is harmless because of the overwhelming proof that the victim suffered bodily injury or was in reasonable fear of bodily injury, which indicates that no rational trier of fact would have found that the defendant contacted the victim in an offensive or provocative way.

### B.  Instruction on the Missing Witness Rule

The record shows that the defendant requested an instruction on the missing witness rule and, during their discussion, the court informed the defendant that Marris Orange was not a "missing witness" if she had not been subpoenaed to be in court. The defense conceded that it did not subpoena her, and the State explained that it had tried to locate her but was unsuccessful.

A party may comment about an absent witness when the evidence shows "that the witness had knowledge of material facts, that a relationship exists between the witness and the party that would naturally incline the witness to favor the party and that the missing witness was available to the process of the Court for the trial." Delk v. State, 590 S.W.2d 435, 440 (Tenn. 1979). The proponent of the instruction bears the burden of establishing these prerequisites. See State v. Bough, 152 S.W.3d 453, 463 (Tenn. 2004).

Here, the defendant failed to prove that Marris Orange was available to the process of the court for trial as the defense failed to subpoena the witness, and the State informed the court that it had attempted to locate her but was unsuccessful. Because the requirements outlined in Delk were not met, the trial court did not err in declining to give an instruction on the missing witness rule.

### C.  Instructions on the Cancellation Rule, Physical Facts Rule, and Duress and Necessity

As to the defendant's complaint that the trial court failed to give instructions on the cancellation rule, the physical facts rule, and duress and necessity, it appears that the defendant did not request such instructions.

Tennessee Code Annotated section 40-18-110 provides in pertinent part:

>    (b) In the absence of a written request from a party specifically identifying the particular lesser included offense or offenses on which a jury instruction is sought, the trial judge may charge the jury on any lesser included offense or offenses, but no party shall be entitled to any lesser included offense charge.

>    (c) Notwithstanding any other provision of law to the contrary, when the defendant fails to request the instruction of a lesser included offense as required by this section, the lesser included offense instruction is waived. Absent a written request, the failure of a trial judge to instruct the jury on any lesser included offense may not be presented as a ground for relief either in a motion for a new trial or on appeal.

Tenn. Code Ann. § 40-18-110(b)-(c). We, therefore, review this issue under the doctrine of plain error. See State v. Page, 184 S.W.3d 223, 230-31 (Tenn. 2006).

We cannot conclude that the trial court's failure to provide instructions on the cancellation rule, the physical facts rule, and duress and necessity rises to the level of plain error because it is not clear that the defendant was entitled to the instructions; thus, there was no breach of a clear and unequivocal rule of law. The defendant's reasons supporting an instruction on the cancellation and physical facts rules simply go to the credibility of the witnesses' testimony. His reason supporting an instruction on duress and necessity, because Chrestman was smoking crack cocaine, is very attenuated and does not clearly entitle him to such instructions.

### D. Flight Instruction

The defendant complains that the trial court gave an "unconstitutional flight instruction." He apparently argues that the portion of the instruction saying, "The flight of a person accused of a crime is a circumstance which, when considered with all the facts of the case, may justify an inference of guilt[,]" unconstitutionally shifted the burden of proof to him. Given that the flight instruction has never been deemed unconstitutional, we cannot conclude that there was a breach of a clear and unequivocal rule of law or, thus, any plain error.

### XIV. Sentencing

The defendant argues that the trial court erred in its sentencing determination;

specifically, in finding that he did not present any mitigating factors, in imposing a seven-year sentence, and in denying him probation.

Under the 2005 amendments to the sentencing act, a trial court is to consider the following when determining a defendant's sentence and the appropriate combination of sentencing alternatives:

(1) The evidence, if any, received at the trial and the sentencing hearing;

(2) The presentence report;

(3) The principles of sentencing and arguments as to sentencing alternatives;

(4) The nature and characteristics of the criminal conduct involved;

(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;

(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and

(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

Tenn. Code Ann. § 40-35-210(b) (2010).

The trial court is granted broad discretion to impose a sentence anywhere within the applicable range, regardless of the presence or absence of enhancement or mitigating factors, and "sentences should be upheld so long as the statutory purposes and principles, along with any enhancement and mitigating factors, have been properly addressed." State v. Bise, 380 S.W.3d 682, 706 (Tenn. 2012). Accordingly, we review a trial court's sentencing determinations under an abuse of discretion standard, "granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." Id. at 707. In State v. Caudle, our supreme court clarified that the "abuse of discretion standard, accompanied by a presumption of reasonableness, applies to within-range sentences that reflect a decision based upon the purposes and principles of sentencing, including the questions related to probation or any other alternative sentence." 388 S.W.3d 273, 278-79 (Tenn. 2012).

Under the revised Tennessee sentencing statutes, a defendant is no longer presumed to be a favorable candidate for alternative sentencing. State v. Carter, 254 S.W.3d 335, 347 (Tenn. 2008) (citing Tenn. Code Ann. § 40-35-102(6)). Instead, the "advisory" sentencing guidelines provide that a defendant "who is an especially mitigated or standard offender convicted of a Class C, D or E felony, should be considered as a favorable candidate for alternative sentencing options in the absence of evidence to the contrary." Tenn. Code Ann. § 40-35-102(6).

A defendant shall be eligible for probation, subject to certain exceptions, if the sentence imposed on the defendant is ten years or less. Id. § 40-35-303(a). A defendant is not, however, automatically entitled to probation as a matter of law. The burden is upon the defendant to show that he is a suitable candidate for probation. Id. § 40-35-303(b); State v. Goode, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997); State v. Boggs, 932 S.W.2d 467, 477 (Tenn. Crim. App. 1996). In order to meet this burden, the defendant "must demonstrate that probation will 'subserve the ends of justice and the best interest of both the public and the defendant.'" State v. Bingham, 910 S.W.2d 448, 456 (Tenn. Crim. App. 1995) (quoting State v. Dykes, 803 S.W.2d 250, 259 (Tenn. Crim. App. 1990)).

There is no bright line rule for determining when a defendant should be granted probation. Bingham, 910 S.W.2d at 456. Every sentencing decision necessarily requires a case-by-case analysis. Id. Factors to be considered include the circumstances surrounding the offense, the defendant's criminal record, the defendant's social history and present condition, the need for deterrence, and the best interest of the defendant and the public. Goode, 956 S.W.2d at 527. Also relevant is whether a sentence of probation would unduly depreciate the seriousness of the offense. See State v. Davis, 940 S.W.2d 558, 559 (Tenn. 1997); Bingham, 910 S.W.2d at 456.

In determining if incarceration is appropriate in a given case, a trial court should consider whether:

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

Tenn. Code Ann. § 40-35-103(1). Furthermore, the defendant's potential for rehabilitation or lack thereof should be examined when determining whether an alternative sentence is appropriate. Id. § 40-35-103(5).

Our review of the record reveals nothing that rebuts the presumption of reasonableness afforded to the trial court. The information contained in the presentence report and presented at the sentencing hearing shows that the court acted properly within its discretion in determining that no mitigating factors existed in this case and in imposing a seven-year sentence. Moreover, among other things, the defendant's classification as a multiple offender, indicating that he is not a favorable candidate for an alternative sentence, and the fact that measures less restrictive than confinement had been applied unsuccessfully to the defendant, supports the imposition of a sentence of confinement. The record supports the trial court's determinations.

## XV. Revocation of Bond

At a bond revocation hearing on August 10, 2010, the prosecutor informed the court that defense counsel was unavailable and had requested another court date. An unidentified attorney then also apprised the court that defense counsel was not present and had asked for another court date. The court set August 18, 2010 as the next court date, after which the prosecutor made "an oral motion for a bond revocation [because] [t]he defendant ha[d] a new arrest" since the last court date. The court ruled, "His bond is revoked until [defense counsel] comes in because I do need to see him."

The defendant argues that the trial court erred in revoking his bond, upon an oral motion by the State, without his counsel being present. The defendant is not entitled to relief, however, because he failed to seek review of the bond revocation under Tennessee Rule of Appellate Procedure 8, the appropriate avenue for seeking such relief. See Tenn. R. App. P. 8(a); see also State v. Moore, 262 S.W.3d 767, 771 (Tenn. Crim. App. 2008); State v. Johnny Owens and Sarah Owens, No. W2001-01397-CCA-R3-CD, 2002 WL 31624774, at *18 (Tenn. Crim. App. Nov. 8, 2002), perm. app. denied (Tenn. Feb. 18, 2003).

## CONCLUSION

Based on the foregoing authorities and reasoning, we conclude that the trial court erred in constructively amending the indictment in its charge to the jury and that the defendant's convictions must be reversed and the case remanded for a new trial. In the event of further appellate review, we have assessed the defendant's remaining issues and discern

-24-

no additional error.

_____
ALAN E. GLENN, JUDGE